UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| NORRIS W. JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6: 07-230-DCR |
| | ) | |
| V. | ) | |
| | ) | **MEMORANDUM OPINION** |
| MRS. L. WALKER, et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

This matter is before the Court for screening of Plaintiff Norris W. Jackson's *pro se* civil rights complaint filed pursuant to 28 U.S.C. §§ 1331 and 1332 and the doctrine announced in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971). Jackson is in the custody of the Federal Bureau of Prisons ("BOP") and is currently incarcerated in the United States Penitentiary-Canaan, in Waymart, Pennsylvania. He claims that his treatment by BOP personnel while he was incarcerated in the Federal Corrections Institution in Manchester, Kentucky ("FCI-Manchester"), in the Eastern District of Kentucky, violated (1) his civil rights under the United States Constitution, (2) certain federal statutes, including 42 U.S.C. §§ 1985, 1986, and 1988; and (3) Kentucky law.

As Jackson is proceeding *pro se*, the allegations in his Complaint must be taken as true and liberally construed in his favor. *See Owens v. Keeling,* 461 F.3d 763, 776 (6th Cir. 2006); *Malone v. Colyer*, 710 F.2d 258, 260 (6th Cir. 1983). However, because Jackson has failed to properly allege this Court's jurisdiction and has otherwise failed to state a claim on which relief

-1-

can be granted, his cause of action will be dismissed, *sua sponte*.[1]  28 U.S.C. § 1915(e); *McGore v. Wrigglesworth*, 114 F.3d 601, 607-8 (6th Cir. 1997).  Additionally, his Motion for Leave to Proceed in forma pauperis will be granted by separate Order.

## I.     BACKGROUND

Jackson  seeks declaratory, injunctive, and monetary relief, including punitive damages. He has asserted claims against the following FCI-Manchester personnel: (1) Mrs. L. Walker; (2) Mr. Collins; (3) Mr. Phillips; (4) Mr. Hilbard; (5) Mr. De La Camera; (6) Mr. A. Ndife; (7) B.J. Johnson; (8) Warden Grondolosky; (9) Mr. G.L. Hall; and (10) Mr. Worthington.  He has also named two inmates, (11) Tony Bennett and (12) Mr. McIntyre.  He asserts that all twelve defendants are sued in their official and individual capacities.

Jackson gives no information concerning the events leading to his incarceration, the facts of which are detailed in *United States v. Jackson*, 103 F.3d 561 (7th Cir. 1996) and *United States v. Jackson*, 186 F.3d 836 (7th Cir. 1999).[2]  The following is a summary or construction of the allegations presented in his complaint [Record No. 2], and in a later pleading and its attached exhibits  [Record No. 6], which he filed in response to the Court's earlier inquiry into his use of the BOP's administrative remedy procedures.  The Court construes the latter submission an amendment of right.

---

[1]      Title 28, section 1915(e)(2) gives the Court the authority to dismiss a case at any time if it determines that the action is frivolous or malicious or fails to state a claim upon which relief can be granted.

[2]       A jury in the Southern District of Illinois convicted Jackson of conspiracy to possess with intent to distribute cocaine, possession of cocaine, use or carriage of a firearm during and in relation to a drug trafficking crime, and unlawful possession of a firearm by a felon.  On appeal, the conviction for carriage of a firearm in relation to a drug trafficking crime was reversed and a re-sentencing was ordered.  Upon re-sentencing, he took another appeal, but the re-sentencing was affirmed in the second above-referenced opinion.

Jackson's allegations begin with events which occurred at FCI-Manchester in January 2006.  He alleges that Mrs. Walker, the Food Service Supervisor, gave him illegal contraband in the form of cigarettes and a lighter.  When he purportedly rejected her sexual advances on January 30th, she asked for the items back, but he refused to return them.  Jackson alleges that Walker then paid three inmates to assault him, and that he was assaulted on that day by the two inmate Defendants (Bennett and McIntyre) and a third prisoner.  He claims to have been seriously injured during the assault.

Jackson further alleges that Walker had a co-conspirator on that day, another Food Service employee, Defendant Collins.  Collins allegedly could have prevented the assault but failed to do so.  Instead, Jackson claims that Collins witnessed and helped end the altercation, but failed to make a proper report.  Jackson claims that  "Defendant Walker put a false e-mail report into the computer system . . . claiming that there was an incident in Food Service involving inmate[s], but that she did not know who was involved. . . ."

On February 2, 2006, Jackson reported the assault to a Mr. Lamoree, who is not named a defendant in this action.  Lamoree allegedly told Jackson about Walker's false report.  According to Jackson, Lamorre also told him that he would put the information from Jackson in a memorandum on his computer in which he had been keeping a record of Mrs. Walker's conduct.  Lamoree allegedly said that he did not want to get involved for fear of retaliation by staff, but he did report the assault to the Food Service Administrator, Defendant De La Camera.

De La Camera is alleged to have violated the Plaintiff's rights by failing to report the actions of Walker and Collins.  Jackson claims that, on May 25, 2006, in retaliation for his

complaints about the January assault, two other Food Service employees (Defendants Phillips and Hilbard) created a paysheet showing falsely that the Plaintiff had not worked in May 2006. He further claims that they wrote a false report charging Jackson with stealing meat. De La Camera is alleged to have failed to properly report Phillips' and Hilbard's actions, and in June, after he learned that Plaintiff had actually worked in May, he delayed paying Jackson until July.

Jackson's allegations and exhibits then jump to the Fall of 2006. On October 10, 2006, Jackson wrote about the alleged assault and cover-up in a 12-page letter to an organization named the Butler Legal Group, in Washington, D.C. [Record No. 6, Ex. A, p.1] His letter was apparently forwarded to the Department of Justice, which, in turn, responded by letter suggesting to the Plaintiff that he contact the BOP and providing the BOP's Washington address. [Record No. 6, Ex. A, p. 13] Plaintiff does not allege that he followed-up on this suggestion. Instead, he complains that the BOP never contacted him.

Jackson's allegations and exhibits then move to 2007. In January, he wrote to Defendant Johnson, who responded that a review had been conducted and no evidence of an assault was found. Johnson's response further stated that "[i]f such an incident occurred, you had the option of going to another staff member and reporting the incident if you felt the staff member neglected to inform the appropriate staff." [Record No. 6, Ex. A, p. 15] Jackson alleges that he wrote to Johnson again on January 25, 2007, and to the warden, Defendant Grondolsky. [Record No. 6, Ex. A, p. 16-20]

In his letter to the warden, Jackson provides a handwritten account of the alleged assault and cover-up. [Record No. 6, Ex. A, p. 18-20] This letter is dated January 25, 2007, and is

-4-

entitled "B.P. 9 - Administrative Remedy Complaint." However, this document was returned to Jackson due to his failure to adhere to administrative rules and to present his request/complaint on the proper B.P.- 9 form. [Record No. 6, Ex. A, p. 21] Jackson states that he resubmitted the complaint on the proper form on February 19, 2007, but never received a response. In contradiction, however, he also claims that on February 16, 2007, Defendant Hall refused to give him the proper BP-9 form. Further, Jackson contends that Hall admitted that the original May 2006 paysheet was a mistake, but he refused to remove it from Jackson's file or to report the responsible persons.

On February 22, 2007, Jackson alleges that he made a telephone call to his family and asked them to contact a lawyer and the American Civil Liberties Union about the assault and cover-up. He contends that this call was intercepted by the BOP. As a result, Jackson was called into a prison office where another Defendant, Lieutenant Worthington, informed him that two days earlier, on February 20, 2007, a BOP investigation had been instituted. That officer took an affidavit from Jackson and allegedly told him that since the matter was under investigation, the warden would not be responding to the BP-9.

Worthington then placed Jackson in Administrative Detention on February 22, 2007, indicating that the reason for the placement was the "pending investigation of a violation of Bureau regulations." [Record No. 6, Ex. A, p. 22] Jackson contends that this reason was false. Instead, he claims that he was moved in retaliation for his being so vocal about the January assault and cover-up. Regardless, on March 19, 2007, Jackson was transferred from FCI-

Manchester, purportedly because it was not a medical facility.  He arrived at his current location

(USP-Canaan) on March 27, 2007.

On April 17, 2007, Jackson had his first meeting with staff at the new facility and

allegedly learned it was not a medical facility and that the transfer was actually "because FCI

Manchester wanted to get rid of me."   Jackson says that he did not try to file anything

administratively at USP-Canaan because

> [it] would be futile to attempt to exhaust administrative remedies for the
> retaliation claims because none of the retaliatory conduct occurred at my present
> facility, USP Canaan and the 20-day period for filing a complaint had already
> passed by the time I learned the real impetus behind the transfer.  Consequently,
> there are no administrative remedies to exhaust regarding the retaliation claims.

[Record No. 6, p. 3]

Jackson filed this action by mail on July 9, 2007.  He claims that in June 2007 he filed

requests for information about the alleged BOP investigation to assist the Court under the

Freedom of Information Act and the Privacy Act, but the BOP did not respond. [Record No. 6,

Ex. A, p. 23]  He also submitted a copy of a July 16, 2007, letter of a complaint which he wrote

to the Office of Information and Privacy about the lack of any BOP response.  [Record No. 6,

Ex. A, p. 24]

The final Defendant named in this action is Mr. A. Ndife, an FCI-Manchester physician's

assistant ("PA").  Jackson claims that Ndife did not properly treated him.  He further asserts that

the PA had been deliberately indifferent to his serious medical needs in violation of the Eighth

Amendment and that his conduct was in retaliation for Jackson's exercise of his First

Amendment rights to complain about the assault.  Jackson alleges that two months after the

assault, in late March 2006, he sought medical attention "for his continued aches, pain, suffering that resulted from the assault on his person on January 30, 2006."  In April, Defendant Ndife requested an evaluation of Jackson's hernia, after which surgery was recommended.  However, Jackson alleges that the surgery was not performed until September 2006.  He also complains of other gaps in his medical care, especially a current delay of 5 months, in which he has been awaiting a referral to an outside cardiologist for heart stress tests.

## II.   DISCUSSION

### A.   Federal Question Jurisdiction and Bivens Claims

Jackson brings this action pursuant to 28 U.S.C. §§ 1331 and 1332 and the authority of *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), in which the Supreme Court "recognized for the first time an implied private right of action for damages against federal officers" who are alleged to have violated a citizen's federal rights.  *Corr. Serv. Corp. v. Malesko,* 534 U.S. 61, 66 (2001).  In 1996, Congress enacted the Prison Litigation Reform Act of 1995 ("PLRA"), 110 Stat. 1321-71, as amended, 42 U.S.C. § 1997e et seq., which contains the following provision:

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a) (2007).   Accordingly, before considering the merits of Jackson's complaint, the Court must first determine whether he pursued his claim administratively.

Although the PLRA was only enacted eleven years ago, courts have long considered the plaintiff's exhaustion of administrative remedies as a prerequisite to judicial action. *See McKart*

-7-

*v. United States*, 395 U.S. 185, 193 (1969) ("The doctrine of exhaustion of administrative remedies is well established in the jurisprudence of administrative law.").   "The doctrine provides 'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'"   *Id.* (*quoting Meyers v. Bethehem Shipbuilding Corp.*, 303 U.S. 41, 50-51 (1938).  In *Porter v. Nussle*, 534 U.S. 516 (2002), the Supreme Court found that, in addition to reducing the quantity and improving the quality of prisoner suits, the exhaustion requirement attempts to eliminate unwarranted federal court interference with the administration of prisons and seeks to "affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Id.* at 525.

The administrative remedies available to inmates confined in BOP institutions are set out in the BOP's Administrative Remedy Program, 28 C.F.R. §§ 542.10-.19 (1998).  Section 542.13(a) directs that an inmate first informally present a request or problem to the staff (thereby providing them with an opportunity to correct the problem) before filing a request for an administrative remedy.   If the inmate cannot informally resolve his issue, then he may file a formal written request (a BP-9 form) to the warden. 28 C.F.R. § 542.14.  If the inmate is not satisfied with the warden's response, he may appeal (BP-10 form) to the Regional Director, and, if not satisfied with the Regional Director's response, the inmate may appeal (BP-11) to the Office of General Counsel.  *See* 28 C.F.R. § 542.15 (a).

The administrative process includes established response times. 28 C.F.R. § 542.18.  As soon as a BP-9 is accepted and filed, the warden has 20 days to respond; the Regional Director,

30 days; and General Counsel, 40 days. *Id*. Only one extension of time of 20-30 days, in writing, is allowed to the agency. However, "[i]f the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of response to be a denial at that level." *Id*.

In the present case, Jackson notes that there was more than a 20-day lapse between his transfer and his alleged discovery of the fact that the transfer was retaliatory. He attempts to use this as an excuse for not raising the transfer issue administratively. However, he did not file any BP-9 within 20 days of any earlier complained of event. According to his own submissions, his first BP-9 about the assault – and the immediately ensuing cover-up – was not written until January 25, 2007, five days before the one-year anniversary of the alleged January 30, 2006, assault. Therefore, his filing is clearly in excess of the 20-day administrative requirement.

Moreover, even if the late-filed BP-9 of February 19, 2007, was proper, the fact that the he did not receive a response to his later BP-9 does not excuse his failure to continue the process to the Regional Director and Central Office. As noted *supra*, the regulation provides, "If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of response to be a denial at that level." *Id*.

Nor does his transfer after filing the BP-9 relieve Jackson of his obligation to pursue the last two steps of the administrative process. First, it is clear that the entire process can be accomplished by mail. Additionally, the regulations provide that they apply to "all inmates in institutions operated by the Bureau of Prisons . . . and to former inmates for issues that arose during their confinement." 28 C.F.R. § 542.10(b). If the regulations apply to persons who are

-9-

no longer BOP prisoners, it is clear that they apply to a prisoner who has merely been moved from one BOP facility to another. *See Cox v. Mayer*, 332 F.3d 422 (6th Cir. 2003).

In addition, the BOP administrative scheme also includes alternatives which were available to Jackson. One such alternative is contained in 28 C.F.R. § 542.14(d)(1), which can be used by a prisoner who believes he or she has some issues which could put him in danger at the prison. That provision provides that,

> [i]f the inmate reasonably believes the issue is sensitive and the inmate's safety or well-being would be placed in danger if the Request became known at the institution, the inmate may submit the Request directly to the appropriate Regional Director. The inmate shall clearly mark "Sensitive" upon the Request and explain, in writing, the reason for not submitting the Request at the institution.

28 C.F.R. § 542.14(d)(1). Despite the availability of this remedy and his contention that the staff was working against him, Jackson does not allege that he even attempted this avenue outside FCI-Manchester. In his Complaint and his later-filed amendments, there is no allegation or exhibit suggesting that the Regional Director ever received notice of any of Jackson's complaints – either by the use of Section 542.14(d)(1) or by the usual procedures in Section 542.15.

Jackson has merely broadly alleged that "all levels of the BOP's administrative remedy process" had knowledge of the assault and cover-up because he wrote the October 10, 2006, letter to the legal group in Washington and that organization, in turn, "sen[t] my complaint down the chain-of-command back to the prison." However, not only does Jackson's correspondence fail to mention the Regional Director, but the law requires more than a prisoner's writing a letter to a distant legal firm nine months after a complained-of event and then waiting to see if it is forwarded to the right people.

-10-

In short, the law requires not only exhaustion of the available administrative remedy process, but the proper exhaustion of that administrative remedy process. *Woodford v. Ngo*, 126 S.Ct. 2378 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Id.* at 2386. In *Woodford v. Ngo*, the Supreme Court discussed the purposes of exhaustion as stated in its earlier opinions, *Nussle*, *supra*, and *Booth v. Churner*, 532 U.S. 731 (2001), and stressed that the benefits of exhaustion "can be realized only if the prison grievance system is given a fair opportunity to consider the grievance." The Court further stated that, "[t]he prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules." *Id.* at 2388.

Here, Jackson did not begin the BOP's system within 20 days of his assault, or within 20 days of any event of which he complains herein. He filed a BP-9 only once, and that effort was tardy and then dropped. No further steps were taken. As a result, Jackson deprived the BOP of a fair opportunity to consider his allegations and to remedy any of the alleged problems. By not exhausting the administrative remedy program, he has also deprived this Court of a record and deprived himself of an opportunity to seek redress from the federal defendants, officially and individually, in this Court.

Because Jackson failed to properly follow the BOP's administrative remedy program to exhaustion, his Constitutional and statutory claims against his BOP custodians under Section 1331 and the doctrine announces in *Bivens* will be dismissed.

**B.     Jurisdiction under 28 U.S.C. §1332**

Jackson next asserts that this Court has diversity jurisdiction to consider his claims under

28 U.S.C. § 1332.  That section provides, in relevant part, that

> [t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--
> (1)  citizens of different States;
> (2)  citizens of a State and citizens or subjects of a foreign state;
> (3)  citizens of different States and in which citizens or subjects of a foreign state are additional parties; and
> (4)  a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

28 U.S.C.A. § 1332(a).  A plaintiff asserting diversity jurisdiction bears the burden of setting

forth affirmative allegations establishing that this court has subject matter jurisdiction.  *See e.g.,*

*Ray v. Bird & Son and Asset Realization Co.*, 519 F.2d 1081, 1082 (5th Cir. 1975); 5 Charles

Wright & Arthur Miller, Federal Practice and Procedure: Civil 2d § 1208, at 101 n.9, 103-04

n.12 (ed. 1990 and 1993 pocket part); 13 B *id.* § 3611, at 516-18 & nn. 27-29, § 3624, at 610

n.20 (ed. 1984 and 1993 pocket part).

A federal court must determine a litigant's citizenship based upon his or her domicile.

*Stifel v. Hopkins*, 477 F.2d 1116, 1120 (6th Cir. 1973).  For a person to be domiciled within a

particular state, he must be physically present in that state and must have either the intention to

make his home there indefinitely or the absence of an intention to make his home elsewhere.  *Id.*

Additionally, the Court must determine the citizenship of a person at the time the plaintiff

commences the lawsuit.  *Ray*, 519 F.2d at 1082.

Jackson allegations satisfy the amount in controversy requirement, as his demands exceed

$75,000.  However, he has not properly alleged diversity of citizenship. Instead, he has merely

-12-

written, "Plaintiff also invokes this Court's . . . Diversity Jurisdiction, given that some of the Defendants may no longer be in Kentucky, and plaintiff is now incarcerated in the Commonwealth of Pennsylvania, at USP Canaan." Therefore, the Court finds that Jackson has failed to carry his burden to establish total diversity of the parties. He fails to even allege his own domicile. A prisoner does not acquire a new domicile when he or she is incarcerated in a different state; instead, he or she maintains his or her pre-incarceration domicile. *Parr v. Grenko*, 1993 WL 259327 (E.D. Pa. July 9, 1993) (*citing O'Brien v. Schweiker*, 563 F. Supp. 301, 302 (E.D. Pa. 1983)). In this case, Jackson has not set forth his domicile or that of any of the defendants for purposes of determining that there is complete diversity.

Accordingly, the Court may not exercise jurisdiction under 28 U.S.C. §1332 and his claims must be dismissed without prejudice. *Gee v. Ball*, 1989 WL 31424 (D.C. Kan. March 31,1989).

### C.    Inmate Defendants

Next, the Court considers Jackson's claims against the two inmate defendants. As an initial matter, the Court notes that, to state a claim that is cognizable as a *Bivens* action, a plaintiff must show that he has been deprived of rights secured by the Constitution or laws of the United States and that the defendants who allegedly deprived him of those rights acted under color of federal law. *Bivens*, 403 U.S. at 397. However, the two federal inmates who allegedly assaulted Jackson on January 30, 2006, were not acting under color of federal law. Even accepting as true that Defendants Bennett and McIntyre did assault Jackson, in response to a bribe or some unknown reason, the Court must find that they were not acting under color of

federal law because the Supreme Court has consistently refused "to extend *Bivens* liability to any new context *or new category of defendants*." *Malesko*, 534 U.S. at 68 (emphasis added).

Nevertheless, individuals may be held liable under some of the other federal statutes alleged by Jackson. More specifically, he has asserted claims against all of the Defendants, under 42 U.S.C. §§ 1985, 1986 and 1988, for conspiring against him. However, the Court finds that he fails to state a cognizable claim under any of these statutes.

First, as to 42 U.S.C. § 1985, entitled "Conspiracy to interfere with civil rights," Jackson has failed to state a claim on which relief can be granted. The first subsection of the statute concerns "(1) Preventing officer from performing duties," and, as its name implies, this statute applies to conspiracies against or interfering with officers of the United States. *See Salmon v. Miller*, 951 F. Supp. 103, 106 (E.D. Tex. 1996) ("[S]ection 1985(1) relates only to officers of the United States.") (*citing Kush v. Rutledge*, 460 U.S. 719, 724 (1983)); *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 283 n. 15 (1993) (same). A cause of action under Section 1985(1) belongs to the federal officer who is *the victim* of the conspiracy. *Id*. Jackson's allegations are obviously not brought under this subsection.

Likewise, Jackson does not state a claim under 42 U.S.C. § 1985(2), entitled "Obstructing justice; intimidating party, witness, or juror," as there was no proceeding toward which the this subsection is directed. Rather, Jackson's allegations appear to rely on the final subsection of 42 U.S.C. § 1985, "(3) Depriving persons of rights or privileges," which, in pertinent part, permits a cause of action for a person victimized by a conspiracy "for the purpose of depriving . . . any person or class of persons of the equal protection of the laws . . . ." 42 U.S.C. § 1985(3).

-14-

However, an inmate's bare allegation of a conspiracy by guards to deprive him of his constitutional rights does not state a claim for civil rights conspiracy. *Amaker v. Foley*, 2003 WL 21383010 (W.D.N.Y.), aff'd, 117 F. App'x 806 (2nd Cir. 2005). To properly allege a civil rights conspiracy under Section 1985(3), a plaintiff must specifically assert that a meeting of the minds occurred among any or all of the purported conspirators. *See Webb v. Goord*, 340 F.3d 105 (2nd Cir. 2003), *cert. denied*, 540 U.S. 1110 (2004); *see also McDowell v. Jones*, 990 F.2d 433 (8th Cir. 1993). Additionally, he must allege facts regarding his race or class membership or facts suggesting that actions were taken against him because of his race or class; if he does not, he fails to state claim for conspiracy to interfere with his equal protection rights under the statute. *Bigbee v. Nalley*, 2007 WL 1012986 (W.D. Wis. Apr. 3, 2007); *Lowe v. Carter*, 554 F.Supp. 831 (E.D. Mich.1982). Here, Jackson has failed to make any allegations as to race. Therefore, he has failed to state a claim under the last portion of Section 1985.

Jackson has also claimed liability under 42 U.S.C. § 1986. Under that section,

> [e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented.

42 U.S.C. § 1986. On the face of this statute, it is clear that a claim under § 1986 depends upon the existence of a claim under § 1985. *Mollnow v. Carlton*, 716 F.2d 627 (9th Cir. 1983), *cert. denied*, 465 U.S. 1100 (1984). Therefore, a plaintiff who has failed to state a valid claim under § 1985 cannot state a claim under § 1986. *D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474 (7th Cir. 1985); *Givan v. Greyhound Lines, Inc.*, 616 F. Supp. 1223 (S.D. Ohio 1985).

-15-

Having found that Jackson has failed to state a claim under Section 1985, the Court must find that he has no claim under Section 1986. As the Sixth Circuit has held, "'Section 1986 is designed to punish those who aid and abet violations of § 1985. We find no violation of § 1985. Accordingly, there can be no violation of § 1986.'" *Haverstick Enter., Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 994 (6th Cir. 1994) (*quoting Browder v. Tipton*, 630 F.2d 1149, 1155 (6th Cir. 1980)).

Jackson's final claim against the two inmates is purportedly based on 42 U.S.C. § 1988, titled "Proceedings in vindication of civil rights." Again, the title of the statute reveals its focus on "any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985 and 1986 of this title." However, as noted previously, there has never been any proceeding that would trigger this statute. Moreover, the law is well-settled that a plaintiff cannot invoke jurisdiction of the federal court solely under 42 U.S.C. § 1988. *See Turman v. Tuttle*, 711 F.2d 148 (10th Cir. 1983). In sum, all of Jackson's federal claims against the Defendant inmates fail.

### D.    Pendent State Law Claims

Jackson has also made claims under Kentucky law, asserting that the Court has pendent jurisdiction pursuant to 28 U.S.C. § 1367. "The decision whether to exercise pendent jurisdiction is generally left to the discretion of the trial court." *Kitchen v. Chippewa Valley Sch.*, 825 F.2d 1004 (6th Cir. 1987). However, 28 U.S.C. § 1367 provides that a district court "may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." Here, because all federal claims against the Defendants will be dismissed, the Court will decline to exercise jurisdiction over the state law

-16-

claims. *See United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966); *Gregory v. Hunt,* 24 F.3d 781 (6th Cir. 1994); 28 U.S.C. § 1367(c)(3).

## III.   CONCLUSION

For the reasons discussed above, it is **ORDERED** that the claims asserted by Plaintiff Norris W. Jackson in his *pro se* Complaint [Record No.2] are **DISMISSED** and this action shall be **DISMISSED**, *sua sponte*, from the Court's docket.   Judgment shall be entered contemporaneously with this Memorandum Opinion and Order in favor of the Defendants.

This 14th day August, 2007.



Signed By:

*Danny C. Reeves* DCR

**United States District Judge**

-17-